**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3070-16T4

SEOUNG OUK CHO,
deceased, by his administrator,
YUNJIN JO, YOUNG HO JO,
and HANA CUI,

      Plaintiffs-Appellants,

v.

TRINITAS REGIONAL MEDICAL
CENTER, NJ HEART, JOHN HAN
SHAO, M.D., and EDWARD G.
WILLIAMS, M.D.,

      Defendants,

and

HYEUN PARK, M.D.,

      Defendant-Respondent.

_____

      Submitted October 16, 2018 – Decided February 20, 2019

      Before Judges Yannotti, Rothstadt and Natali.

      On appeal from Superior Court of New Jersey, Law Division, Union County, Docket No. L-0104-11.

Kimm Law Firm, attorneys for appellants (Michael S. Kimm, on the brief).

Dughi, Hewit & Domalewski, attorneys for respondent (Elizabeth A. Farrell, on the brief).

PER CURIAM

In this medical malpractice/wrongful death action, plaintiffs Yunjin Jo and Young Ho Jo, were decedent Seoung Ouk Cho's siblings, Yunjin Jo served as the administrator of Cho's estate, and plaintiff Hana Cui was Cho's fiancée. A jury returned a verdict of no cause as to plaintiffs' claims against Cho's cardiologist, defendant Dr. Hyeun Park, the only defendant left in the case when the matter was tried. Plaintiffs appeal from the trial court's July 8, 2016 order granting defendant partial summary judgment, its February 7, 2017 judgment in favor of defendant, and its March 17, 2017 order denying their motion for judgment notwithstanding the verdict (JNOV), or for a new trial. For the reasons that follow, we affirm.

On appeal, plaintiffs challenge several of the trial court's rulings that they claim prevented the jury from being able to properly assess the evidence, and that a "miscarriage of justice ha[d] occurred" warranting either the entry of judgment in their favor or a new trial. Specifically, they argue that the trial court erred by denying their request for an adverse inference charge to the jury

because defendant concealed critical evidence consisting of Cho's billing, payment and medical records. They also contend the trial court (a) improperly barred testimony about Cho's statements that demonstrated defendant delayed admitting Cho to the hospital because Cho lacked funds; (b) erred in not permitting plaintiffs' counsel to use a treatise to cross examine defendant's expert; (c) improperly dismissed their claim for economic damages under the Wrongful Death Act (the Act), N.J.S.A. 2A:31-1 to -6; and (d) erred by allowing testimony about Cho's smoking habits when defendant never asserted an "affirmative defense" about Cho's smoking, and then refused to allow plaintiffs' counsel to cross examine about defendant's affirmative defenses. We find no merit to these contentions and affirm.

I.

In an earlier opinion, we considered an appeal by plaintiffs from the trial court's prior in limine dismissal of plaintiffs' complaint. We vacated the dismissal and remanded the matter for trial. See Cho v. Trinitas Reg'l Med. Ctr., 443 N.J. Super. 461 (App. Div. 2015). In that opinion, we summarized the facts giving rise to plaintiffs' claims. See id. at 464-69. As we noted, defendant was Cho's primary care cardiologist who, after examining Cho on April 23, 2009, "admitted him to [defendant] Trinitas Regional Medical Center [(Trinitas)]

A-3070-16T4

because Cho complained of chest pain and had an abnormal electrocardiogram (EKG)." Id. at 464. After being admitted to the hospital, Cho was treated by other doctors who performed procedures in attempt to address his heart issues.

Cho was later discharged from the hospital but by July 16, 2009, he was experiencing pain and discomfort. On that date, while working for defendant NJ Heart, defendant prescribed a stress test for Cho. During the stress test that was performed on July 21, 2009 by another doctor, defendant Edward G. Williams, Cho required emergent medical attention and was admitted to the hospital, where he tragically suffered a fatal heart attack a few days later.

In our earlier opinion, we also summarized plaintiffs' claims and their supporting proofs as follows:

> The[] complaint alleged wrongful death, medical negligence and breach of contract for medical services. As for the injury suffered, plaintiffs alleged they "lost their loved one; have suffered loss of society and consortium; and have lost other rights in relation to plaintiff Cho." Their answers to interrogatories identified plaintiffs' claim for economic damages as follows: "Plaintiff-decedent has lost at least $50,000[] per year for at least [thirty-two] years as plaintiff-decent [sic] would have owned and operated his own business at least until age [seventy]." In her deposition, Yunjin[1] testified she incurred approximately $10,000 in funeral expenses for Cho. No documentation was provided to corroborate this expense or plaintiffs'

---

[1] We use first names for clarity and to avoid any confusion.

A-3070-16T4

claims that Cho had his own business, earned any amount of income or provided any financial support to any of the plaintiffs.

[Id. at 465.]

Before the earlier appeal, in addition to the trial court's dismissal of plaintiffs' claims against defendant, it had dismissed their claims as to all other defendants for various reasons that are not relevant to the present appeal. It also entered other orders that affected plaintiffs' anticipated proofs at trial. Among the orders was one granting defendant partial summary judgment and dismissing Cui's claims under the Act as well as another order barring plaintiffs' economic expert's testimony based upon his report being a net opinion. Id. at 466. We observed that "[a]s a result of the order barring [the] expert opinion, plaintiffs lacked expert testimony to support their claims that they suffered the loss of economic support from Cho." Id. at 466-67.

On remand, before trial, defendant moved for partial summary judgment, which the court granted, dismissing plaintiffs' claims for punitive and pecuniary damages under the Act. Plaintiff later filed four motions in limine, one of which asked the trial court to deliver an adverse inference charge to the jury based on defendant's failure to turn over billing records. After considering the parties'

arguments, which included portions of defendant's unrefuted deposition testimony,[2] the trial court denied the motion.

At trial, plaintiffs called Yunjin, Cui, Dr. Williams, and plaintiffs' cardiology expert, Dr. Robert Stark. Defendant testified on his own behalf and called a cardiology expert, Dr. S. Kenneth Jacobson.

Yunjin testified about Cho's pain and discomfort, his medical history, and treatment. According to Yunjin, Cho had two stent procedures and after the second procedure, he "complained about . . . chest pain and nausea or vomiting[, so] he went to see" defendant on July 16, 2009. According to Yunjin, "[w]hen [Cho] went to the hospital[,] he was told to get a test done on July 21st. And he was also asked to bring more money . . . for the fee."[3] In response to defense counsel's objection, the court instructed the jury to disregard Yujin's testimony about Cho being asked for money by someone in defendant's office.

---

[2] During defendant's deposition, he testified that he was not involved with NJ Heart's billing, had no knowledge about Cho's finances and had no recollection of ever discussing payment for his services with Cho or any other patient. He also stated that he "treat[ed his] patients regardless if they pay or not" and if any "show[ed] up without medical insurance and without the ability to pay for service, [he would] still treat that patient."

[3] It is not clear from the record whether Yunjin meant someone at NJ Heart or Trinitas told her brother to bring money for the fee.

6

Prior to Cui testifying, the trial court barred her from telling the jury that defendant ordered the stress test on July 16, rather than seeing Cho or sending him to the hospital, because of Cho's inability to pay for treatment. Cui testified about Cho's understanding of his doctor's descriptions of his medical issues. She stated that she "was told that [Cho had] three arteries, blood vessels that [were ninety] percent . . . clogged, [seventy] percent, [fifty] percent, [forty] percent] . . . clogged . . . ." She stated that Cho "continuously . . . complained about the pains, his comfort[,] and that it was hard for him to breath[e] . . . . but they told him that he has to get used to it."

Williams testified regarding the stress test he administered to Cho at Trinitas on July 21. He stated that during the test, he became aware that Cho was experiencing chest pain and was unable to complete the test. Williams stopped the treadmill, treated Cho with "a Nitroglycerin spray," and later, "when [Williams] looked at the nuclear pictures, [he] saw an abnormality and called [defendant, Cho's] primary cardiologist."

Stark testified that defendant's decision to refer Cho for a stress test, instead of admitting him to the hospital on July 16, 2009, constituted a deviation from the accepted standard of care. He stated that when defendant was confronted with Cho's medical history and complained of experiencing chest

pain on an increasing basis with shortness of breath, ordering a stress test rather than hospitalization was a mistake. He opined that there was no need for a stress test because defendant "already kn[e]w [Cho had] coronary disease," and waiting for the test to be done exposed Cho to "stressing him on a treadmill [which] may [have] worsen[ed] his situation" and "delay[ed] getting the patient . . . appropriate medical care." Stark concluded "[defendant's] decisions led to . . . a real delay in . . . Cho getting to the hospital and getting definitive care, it . . . contributed to his death." When asked about the impact of Cho's smoking on the chance of him experiencing a fatal heart attack, Stark responded that "[i]t just contributes a little extra risk compared to someone who's a non-smoker."

Defendant testified about the reason for ordering the stress test and why he did not order Cho to go to the hospital on July 16, 2009 for additional procedures. He stated that based on Cho's prior history, treating him with medication was the appropriate option but he told Cho that if he was not feeling better, he should go to the hospital. He explained:

> [O]n July 16th when I saw him I already had gotten his anatomy. I already knew that his arteries were fixed. His two culprit arteries, the major issue arteries were fixed. So at that point, you know, when I saw him and he was complaining of chest pains I said well you know what, let me first do an EKG, make sure he's not actively ischemic. And I saw that. So what happens, you know, after you get a stent and you want to now

8

find out what is going on? Is this due to one of his prior closures? Is it due to one of his native vessels? Because remember he had other blood vessels that were still blocked. His proximal . . . left anterior descending, was still [forty] percent blocked. He had a diagonal branch off of that that was [fifty] percent blocked. That in and of itself can still cause chest pain, but we actually don't do anything for that other than medication treatment . . . ., which he was on and that's why I thought well let me give him medications, make sure he feels better. And you know certainly if he's feeling worse he has to go to the emergency room. And I instructed him on that.

Defendant also testified about Cho's history of smoking. He stated that when he initially treated Cho, he prescribed medication to help him stop smoking because "smoking is the number one modifiable risk factor for coronary artery disease." At no point during trial did defendant mention Cho's inability to pay for treatment or anything else relating to Cho's financial status.

Jacobson testified that ordering a stress test did not constitute a deviation from the acceptable standard of care. According to Jacobson, it was "appropriate" for defendant not to send Cho to the emergency room because Cho already "had interventions to restore circulation to the heart[,]" had a "cardiogram [that] was normal[,]" and as demonstrated by his echocardiogram, his heart function was normal. He explained that at the time, the stress test was necessary to determine the source of Cho's chest pain and that without the test,

9

the doctor "wouldn't have known what to do or where . . . the problem, if any, [was] occurring." He also opined that there was not any harm in waiting a few days to have the stress test and concluded "in retrospect, even knowing that it didn't turn out well, . . . [defendant's] care was absolutely and perfectly proper."

At the conclusion of the trial, the jury determined that defendant was not negligent in his care and treatment of Cho. The trial court entered judgment in defendant's favor on February 7, 2017.

On February 27, 2017, plaintiffs moved for JNOV, under Rule 4:40-2(b), or alternatively, a new trial, under Rule 4:49-1(a). Plaintiffs argued the court erroneously denied their request for an adverse inference charge regarding the billing records and precluded Cho's pre-death statements about his physical condition and payment history, Cui's testimony regarding payment, and Stark's testimony regarding the treatise. Plaintiffs also argued that the court erred in failing to take judicial notice of the treatise and precluded defendant's smoking emphysema defense.

On March 17, 2017, the trial court issued an order denying plaintiffs' motion. In its oral decision, the trial court stated that plaintiffs' motion was untimely, and therefore procedurally barred, but chose to address the merits of the motion regardless. The court rejected plaintiffs' arguments stating that there

was no spoliation of the billing records because defendant was an employee of the medical group and "never had the evidence in the first place." It added that it permitted Cui's testimony about pain and suffering but any statements about medical bills were not trustworthy and did not fit under any hearsay exceptions. Moreover, it explained the treatise at issue was never disclosed by plaintiff or by Stark in his report and was thus barred as a discovery violation. This appeal followed.

## II.

Our review of the denial of a motion for JNOV under Rule 4:40-2 is de novo "[a]lthough we defer to the trial court's feel for the evidence . . . ." Lechler v. 303 Sunset Ave. Condo. Ass'n, Inc., 452 N.J. Super. 574, 582 (App. Div. 2017). We do not, however, "owe [any] . . . special deference to the trial court's interpretation of the law." Ibid.

"In reviewing [the denial of the] motion[,] . . . we apply the same standard that governs the trial courts." Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016). That standard requires that "if, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion

11

must be denied[.]" Ibid. (alteration in original) (quoting Verdicchio v. Ricca, 179 N.J. 1, 30 (2004)). We do not consider "'the worth, nature or extent (beyond a scintilla) of the evidence,' but only review 'its existence, viewed most favorably to the party opposing the motion.'" Lechler, 452 N.J. Super. at 582 (App. Div. 2017) (quoting Dolson v. Anastasia, 55 N.J. 2, 5-6 (1969)).

We consider the denial of plaintiffs' Rule 4:49-1(a) motion for a new trial, applying the same standard as the trial court, with "considerable deference" to the trial court because it "has gained a 'feel of the case' through the long days of the trial." Lanzet v. Greenberg, 126 N.J. 168, 175 (1991); see also Caldwell v. Haynes, 136 N.J. 422, 431-32 (1994). However, "a trial court's determination is 'not entitled to any special deference where it rests upon a determination as to worth, plausibility, consistency or other tangible considerations apparent from the face of the record with respect to which [it] is no more peculiarly situated to decide than the appellate court.'" Caldwell, 136 N.J. at 432 (quoting Dolson, 55 N.J. at 7). We set aside jury verdicts with "great reluctance[] and only in cases of clear injustice." Boryszewski v. Burke, 380 N.J. Super. 361, 391 (App. Div. 2005).

"A motion for a new trial may be granted, . . . [even though] the state of the evidence would not justify a [JNOV]." Judge v. Blackfin Yacht Corp., 357

N.J. Super. 418, 424 (App. Div. 2003). "[T]he standard for authorizing a new trial [is] one that requires a determination that the jury's verdict [be] 'contrary to the weight of the evidence or clearly the product of mistake, passion, prejudice or partiality.'" Crawn v. Campo, 136 N.J. 494, 512 (1994) (quoting Lanzet, 126 N.J. at 175). "On a motion for a new trial, all evidence supporting the verdict must be accepted as true, and all reasonable inferences must be drawn in favor of upholding the verdict." Boryszewski, 380 N.J. Super. at 391. A court must "'canvass the record . . . determine whether reasonable minds might accept the evidence as adequate to support the jury verdict . . . .'" Judge, 357 N.J. Super. at 424 (quoting Dolson, 55 N.J. at 6).

A court should only grant a new trial where "there was a miscarriage of justice under the law." R. 2:10-1; R. 4:49-1(a). Under Rule 4:49-1(a), it must be determined "whether the jury verdict was 'a miscarriage of justice under the law' to warrant a new trial . . . ." Judge, 357 N.J. Super. at 424 (quoting R. 4:49-1(a)). A "miscarriage of justice" is a "'pervading sense of "wrongness" . . . [which] can arise . . . from manifest lack of inherently credible evidence to support the finding, obvious overlooking or undervaluation of crucial evidence, [or] a clearly unjust result . . . .'" Risko v. Thompson Muller Auto. Grp., Inc.,

206 N.J. 506, 521(2011) (alterations in original) (quoting <u>Lindenmuth v. Holden</u>, 296 N.J. Super. 42, 48 (App. Div. 1996)).

### III.

With these guiding principles in mind, we turn to plaintiffs' contentions on appeal. At the outset, to the extent that plaintiffs argue that under <u>Rule</u> 4:40-2(b), there was no evidence to support the jury's verdict or under <u>Rule</u> 4:49-1, the weight of the evidence was against the jury's verdict, we conclude that their arguments are without sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E). We only observe that as with most medical negligence cases, there was conflicting expert testimony and the jury was free to accept or reject either opinion regarding defendant's liability.

### IV.

We next consider plaintiffs' contentions about the trial court's rulings causing a miscarriage of justice. We begin with their arguments relating to their request for an adverse inference charge based upon defendant's failure to turn over certain records during discovery. At trial, the court denied the request, explaining that at the time plaintiffs sought the records from defendant, his former employer, NJ Heart, not defendant, had possession and control of the

14

records plaintiffs demanded. Because he did not have "dominion and control over" the documents at any time, an adverse inference was not warranted.

On appeal, plaintiffs argue that because defendant withheld the billing records during discovery, "the trial judge should have charged the jury with [an] adverse inference as to the[ir allegation that the] financial arrangement [was] the basis of . . . [defendant's] failure to render immediate cardiac catheterization to . . . Cho . . . ." According to plaintiffs, "Cho was denied critical medical service because he did not have enough money" and it was error for the trial court to conclude "that a doctor could be sued for malpractice but could not be expected to produce the entire patient chart that contained the disputed billing and payment history . . . ." We disagree.

"The spoliation inference permits the jury to infer that the evidence destroyed or concealed would not have been favorable to the spoliator." Jerista v. Murray, 185 N.J. 175, 202 (2005). It is only warranted "against [a] party that cause[s] the loss of evidence." Id. at 201-02; see also Rosenblit v. Zimmerman, 166 N.J. 391, 401-02 (2001). The instruction should be provided if a party establishes that the other party "improperly caused the loss of the evidence." Davis v. Barkaszi, 424 N.J. Super. 129, 148 (App. Div. 2012).

Here, the judge did not err by refusing to provide an adverse inference charge to the jury. The record demonstrated that plaintiffs asked defendant to produce the billing and medical records related to Cho's treatment. Defendant responded by stating that he could not produce the requested records because he no longer worked for NJ Heart, the entity that had the records, and plaintiffs never subpoenaed the records from that group. Under these circumstances plaintiff did not establish that defendant concealed, lost, or destroyed any evidence. There was no error in the denial of plaintiffs' request.

V.

Next, we turn our attention to plaintiffs' challenge to the trial court's evidentiary ruling barring plaintiffs' testimony about Cho's statements that allegedly established his financial circumstances and "status as an uninsured, self-pay patient, [which] animated . . . [defendant]'s decision on July 16 2009, to send [him] for a stress test rather than admit him to the [e]mergency [r]oom . . . ." According to plaintiffs', the evidence was admissible as a hearsay exception under Rule 804(b)(6).

The trial court began its consideration of the challenged testimony during Yunjin's testimony about Cho stating that somebody said to him that he needed "to bring more money . . . for the fee[,]" by reviewing the applicable standard

16

for admission of a decedent's statement under Rule 804(b)(6). The court stated that before admitting it, a trial court must be satisfied that the "statement was made in good faith[,] . . . was made upon the declarant's own personal knowledge[,] and there is a probability from the circumstance that the statement is trustworthy." It also observed that admission was "still limited by our Rule[] 401 . . . . [which] talks about what relevance is. . . . [and] 403 [that] talks about whether the prejudice outweighs the probative value." It then concluded that the statement, if made, was hearsay and even if admissible under the rule, it was not relevant. The trial court stated it "unders[tood] . . . this case is about [defendant]'s decision . . . whether or not to hospitalize [Cho] or schedule him for the stress test . . ., as opposed to anything that happened before" sending him for the stress test on a July 16. In addition, the trial court found the information "overwhelming[ly]" prejudicial under Rule 403 because the "jury may have . . . an idea planted in their head that somehow that there is this secondary issue here, which is not part of this case."

Cui's testimony was also barred for similar reasons. The trial court stated:

> [Y]ou're asking this jury to speculate that for some reason he was sent for a stress test instead of the hospital because he didn't have money based on a deceased declarant without any other corroborative evidence. I don't find . . . it to be inherently trustworthy. And I think the prejudice far outweighs

17

any probative value it would have. . . . so I'm not going to allow that testimony in this case.

On appeal, plaintiffs contend that, it was error for the trial court to sustain defendant's numerous objections to the testimony and by doing so it prevented "the jury . . . [from] appreciat[ing] her entire testimony . . . ." They also contend Cui's testimony that defendant "claimed that . . . Cho did not have enough funds and [was] refused treatment and told . . . to 'come back' another time . . . . was unfairly precluded" as hearsay. We find no merit to these contentions.

Rule 804(b)(6) "permits, in civil cases, admission of a statement made by a person unavailable as a witness because of death if the statement was made in good faith upon declarant's personal knowledge in circumstances indicating that it is trustworthy." Estate of Grieco v. Schmidt, 440 N.J. Super. 557, 561 (App. Div. 2015) (quoting N.J.R.E. 804(b)(6)); see also DeVito v. Sheeran, 165 N.J. 167, 194 (2000). "'The court need find only a probability that the statement is trustworthy from the flavor of the surrounding circumstances. The determination is a subjective one.'" DeVito, 165 N.J. at 195 (quoting Beckwith v. Bethlehem Steel Corp., 185 N.J. Super. 50, 63 (Law Div. 1982)). Admission of Rule 804(b)(6) evidence, like all other evidence, is subject to the requirement for relevancy under Rule 401 and for not being substantially prejudicial under Rule 403.

As with all evidentiary rulings, our review of a trial court's determination under the Rule is "limited to examining the decision for abuse of discretion." Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008). "When a trial court admits or excludes evidence, its determination is 'entitled to deference absent a showing of an abuse of discretion, i.e., [that] there has been a clear error of judgment.'" Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (alteration in original) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). Therefore, "we will reverse an evidentiary ruling only if it 'was so wide off the mark that a manifest denial of justice resulted.'" Ibid. (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)) Our standard of review applies to a trial court's determination of whether to admit evidence under Rule 804(b)(6), see Estate of Grieco, 440 N.J. Super. at 567, and whether that evidence, if admissible, is relevant under Rule. 401 and if so, "whether its probative value is substantially outweighed by its prejudicial nature" under Rule 403. Green, 160 N.J. at 492; N.J.R.E. 401; N.J.R.E. 403. See also State v. Lykes, 192 N.J. 519, 534 (2007).

"Our analysis of the trial court's evidentiary ruling begins with the question of relevancy, 'the hallmark of admissibility of evidence.'" Griffin, 225 N.J. at 413 (quoting State v. Darby, 174 N.J. 509, 519 (2002)). Relevant evidence is defined as evidence that has "a tendency in reason to prove or

disprove any fact of consequence to the determination of the action." Ibid. (quoting N.J.R.E. 401). "Courts consider evidence to be probative when it has a tendency 'to establish the proposition that it is offered to prove.'" State v. Burr, 195 N.J. 119, 127 (2008) (quoting State v. Allison, 208 N.J. Super. 9, 17 (App. Div. 1985)). The evidence must be probative of a fact that is "'really in issue in the case[,]'" as determined by reference to the applicable substantive law. State v. Buckley, 216 N.J. 249, 261 (2013) (quoting State v. Hutchins, 241 N.J. Super. 353, 359 (App. Div. 1990)). "Once a logical relevancy can be found to bridge the evidence offered and a consequential issue in the case, the evidence is admissible, unless exclusion is warranted under a specific evidence rule." Burr, 195 N.J. at 127; see N.J.R.E. 402.

Under Rule 403, a trial court may exclude relevant evidence "if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence." In general, "[e]vidence claimed to be unduly prejudicial [can be] excluded only when its 'probative value is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation' of the issues in the case." Griffin, 225 N.J. at 421 (third alteration

in original) (quoting State v. Koskovich, 168 N.J. 448, 486 (2001)). Under Rule 403, excludable evidence includes evidence that pertains to subordinate issues. See Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 6 on N.J.R.E. 403 (2018) (addressing excludable evidence in a criminal trial). "[W]hen a party challenges the admission of evidence under [Rule] 403, the question is not whether the challenged testimony will be prejudicial to the objecting party, 'but whether it will be unfairly so.'" Griffin, 225 N.J. at 421 (quoting Stigliano v. Connaught Labs., Inc., 140 N.J. 305, 317 (1995)).

Applying these guiding principles, we conclude that the trial court did not abuse its discretion by excluding evidence of Cho's alleged statements about his conversations with unidentified individuals at defendant's former employer's office or the hospital related to his needing to pay certain fees in order to receive treatment. Plaintiffs' arguments to the contrary are without merit as the evidence clearly failed to meet the threshold test for relevancy. The issue in the case was whether defendant breached his duty of care to Cho by not sending him to the hospital on July 16, 2009. We agree with the trial court's conclusions that whether someone told Cho that he was not being treated because of being unable to pay a fee was not the issue for the jury to decide, only whether it was negligent for defendant not to admit Cho to the hospital, as alleged by plaintiffs.

## VI.

Next, plaintiffs assert that the trial court erred by prohibiting their counsel from using a textbook to cross-examine Jacobson, as the book "[was] authoritative in the field of cardiology, and was subject to judicial notice under [Rule] 803(c)(18). . . . [e]ven if it was never disclosed in discovery[.]" We disagree.

Prior to trial, defendant served plaintiffs with interrogatories that asked plaintiffs to identify any treatise that they or their expert "intend[ed] to rely on or use in any way at trial . . . ." Plaintiffs did not identify any treatise and instead responded by stating the information would "be supplemented when information of this kind is developed during the course of discovery." No related information was ever provided and Stark did not mention the book in his report. At trial, Stark testified that he was aware of the treatise but did not testify that it was authoritative.

During cross examination of Jacobsen, the trial court precluded plaintiffs' use of the treatise because, despite defendant's specific interrogatory, plaintiffs did not disclose they intended to rely upon it, it was not mentioned in their expert's report, or identified in the parties' required pretrial exchange under Rule 4:25-7. The trial court also rejected plaintiffs request that it take judicial notice

of the treatise because the court had never heard of the treatise. The court concluded "someone should have been given a heads up somewhere along the way. Without that, it's trial by ambush. It's just not appropriate."

On appeal, according to plaintiffs, "[i]t is well-settled that medical texts that are authoritative in [their] subject field are admissible as a hearsay exception under . . . Rule 803(c)(18), so long as the text is established as a reliable authority by testimony, . . . or by judicial notice." Relying on Jacober v. St. Peter's Med. Ctr., 128 N.J. 475 (1992), they argue that they should have been permitted to use the treatise to cross-examine Jacobson "because the text contradicted what [he] was saying."

In general, "learned treatises are inadmissible hearsay when offered to prove the truth of the matter asserted therein because the author's out-of-court statements are not subject to cross-examination . . . [but] they may be used to impeach the credibility of witnesses on cross-examination[,]" Jacober, 128 N.J. at 486, when the witness recognizes that the text is authoritative. DaGraca v. Laing, 288 N.J. Super. 292, 299 (App. Div. 1996) (citing Jacober, 128 N.J. at 498). If the witness does not accept the publication as authoritative, it may be shown to be a "reliable authority by experts other than the cross-examined

expert, as well as by judicial notice." Jacober, 128 N.J. at 490; see also N.J.R.E. 201(b).

"[A] text will qualify as a 'reliable authority' if it represents the type of material reasonably relied on by experts in the field." Jacober, 128 N.J. at 495. In making a reliability determination, "[t]he focus should be on what the experts in fact rely on, not on whether the court thinks they should so rely." Id. at 495-96 (alteration in original) (quoting Ryan v. KDI Sylvan Pools, Inc., 121 N.J. 276, 289 (1990)). If there is any doubt as to the reliability of the text, the court should conduct a Rule 104 hearing, either before or during the trial, "to determine whether the text qualifies as a learned treatise." Id. at 496.

Here, we conclude the trial court did not abuse it discretion by barring the treatise from being used for any purpose. The treatise proffered by plaintiffs was never accepted as authority by defendant's expert or even through plaintiffs' expert, and it was not susceptible to judicial notice. See N.J.R.E. 201(b) (addressing information amenable to judicial notice). Even if it was, as the trial court found, plaintiffs never disclosed that the treatise would be used for any purpose at trial, and did not object to the inquiry during discovery or before trial so as to create a pre-trial issue to be determined by the court in limine as required by Rule 4:27-5. Moreover, because they did not identify medical works in their

24

answers to interrogatories, the attempt to use the treatise at trial posed the risk of unfair surprise. See Wymbs v. Twp. of Wayne, 163 N.J. 523, 544 (2000). Under these circumstances, the trial court properly enforced our policy against "trial by ambush." Plaza 12 Assocs. v. Carteret Borough, 280 N.J. Super. 471, 477 (App. Div. 1995) (quoting Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 4:10-2 (1995)).

VII.

Plaintiffs' next contention challenges the July 16, 2016 award of partial summary judgment dismissing plaintiffs' claim for damages under the Act. Plaintiffs argue that they are "entitled to recover all damages regardless of [Cho's] immigration status[.]" According to plaintiffs, "[t]he [c]ourt mistakenly [inferred] that . . . Cho must have been 'improperly working' in the [United States], and hence somehow [Cho was not entitled] to an income loss claim." They contend "[Yunjin] would have testified that [Cho] was properly able to work in the United States."

In its oral decision addressing plaintiffs' claims under the Act, the court described in detail the evidence of loss proffered by plaintiffs and concluded it was insufficient to sustain a claim under the Act. Notably, the court never

mentioned anything about Cho's immigration status or stated that he was "improperly working" in the United States.

We conclude from our de novo review, applying the same standard as the trial court, see Conley v. Guerrero, 228 N.J. 339, 346 (2017), that plaintiffs' arguments claiming that summary judgment was erroneously entered are without sufficed merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E). We affirm the award substantially for the reasons expressed by the court in its thorough oral decision.

## VIII.

We reach a similar conclusion as to plaintiffs' arguments about the inadmissibility of testimony about Cho's smoking.  Plaintiff's contend that defendant "never asserted any 'affirmative defense' based upon . . . Cho's smoking/[emphysema]/predisposition at any time until the trial" and that if he wished to testify as to Cho's smoking, it "should have been an affirmative defense stated in [defendant's] answer."  Plaintiffs further contend that they were precluded by the trial court from adequately cross-examining defendant on this topic.

We again conclude that plaintiffs' arguments are without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).  We only observe

26

that plaintiffs fail to recognize the distinction between an affirmative defense and a general defense. An affirmative defense must be pled and does not challenge the essential elements of a plaintiff's cause of action, but instead assumes its legal sufficiency, while seeking to bar the claim. Buteas v. Raritan Lodge No. 61 F. & A.M., 248 N.J. Super. 351, 363 (App. Div. 1991); see also R. 4:5-4 (addressing the requirement for pleading specific affirmative defenses). A general "defense goes to the legal sufficiency of the pleading, ordinarily connoting the failure of the complaint to state either a cognizable cause of action or all of the elements of a cognizable cause of action[,]" and can be raised at any time, including during a trial. Buteas, 248 N.J. Super. at 363. Testimony about Cho's smoking was unrelated to any affirmative defense.

IX.

To the extent that we have not specifically addressed any of plaintiffs' remaining arguments, we conclude they too are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3070-16T4